1-818-366-ALTAIR-GLOBAL v. Employees Retirement System 1-818-376-ALTAIR-GLOBAL v. Employees Retirement System 1-818-411-Puerto Rico AAA Portfolio Bond Fund Employees v. Employees Retirement System 1-855-1858-EMPLOYEES-RETIREMENT-SYSTEM 1-818-1868-Puerto Rico AAA Portfolio Bond Fund Employees Retirement System Mr. Bennett, before you start, I have a few remarks for all counsel on the case. It won't surprise you that the panel has spent a great deal of time on this case, and we are well prepared on it. It would be most helpful to the Court if you could address Issue 2, the perfection by the UCC freeze and the lapse question, which is inherent in that question. It is, of course, your choice as to what issues you want to argue, but it would be most helpful to the Court if you could start there. I think we can agree that the outcome of that issue may mean that other issues will not have to be addressed. Okay, Your Honor. For the record, Bruce Bennett of Jones Day for the appellants, and with Court's permission, I'd like to reserve five minutes for rebuttal, if that's okay. Yes, you may have it. Okay. So, thank you, Your Honor. I'll begin in the area where you have suggested the Court has the most questions. I do want to start, though, by pointing out that an important place to start here is the definition of what a financing statement is, because a financing statement means a record or records composed of an initial filing statement and any filed record relating to the initial financing statement. And so, when the Court went piece of paper by piece of paper recognizing that six statements were returned from the search, that was actually the wrong way to look at the pieces of paper. You're supposed to look at them all together. And I'll come back to that in a second, but I think it also bears in mind the question that you asked. Starting with lapse, the relevant sections are at the back of our reply brief because it came up in sections of the Puerto Rico UCC. And so, I think there's two provisions that are relative to the lapse question. One is the effectiveness of action taken before effective date. It's 9705-19-LPRA-2405. And it says, pre-effective date filing, the filing of a financing statement before this Act takes effect is effective to perfect the security interest to the extent the filing would satisfy the applicable requirements for perfection under this chapter. And note that it talks about filing, not perfection. So, the filing continues and goes all the way past the change in the law. And then, the next provision to look at is 2407-19-LPRA-2407. And that's new Puerto Rico Article 9-707. And it's B of that section that says you can amend previously filed financing statements. And the specific method is in C, Open Print 1. So, that's the mechanics of how the documents get before you. Now, in terms of the so-called lapse question, there were two sets of transition provisions that were enacted by Puerto Rico. The first set of transition provisions made perfectly clear that the existing filed financing statements would remain effective. Again, not necessarily fully perfected ones, but filed financing statements would be effective for 10 years. And that one clearly did have retroactive effect. But, again, it didn't matter because in Puerto Rico, the prior period was 10 years and they were just continuing the existing period. A year later, Puerto Rico decided they wanted to conform to the rest of the country with respect to newly filed financing statements. And that's when they enacted the five-year limit. But when they enacted the five-year limit, the same retroactive provision wasn't applicable. There was no retroactive provision for the second five-year period. And so, that made clear that the 10-year period continued for financing statements that had been filed before the effective date of the amendment. This was the subject of not just a summary letter, but a fairly thorough letter by the Business Transaction Registry of the Commonwealth of Puerto Rico, which is at our supplemental addendum at page 38, and I think it runs for a few pages with exhibits. And it's both in English and Spanish version. The Spanish version being the version you have provided as opposed to an official translation. In this instance, there's both. So, pages 38, I think the Business Transaction Registry issued it both ways. So, the English language version is at supplemental addendum 38 and 39. And then the Spanish version is at supplemental addendum 40 and 41. I think they're both there. And so, I think that deals with the last question. The other issue, I guess, relates to whether or not an amendment, if it has to stand alone, and as I said before, I don't think it was had to based upon the definition of financing statement that's in the UCC itself. And also the holding of the Kinley case. The amendments have all the information that is required to be an initial financing statement. And, of course, we know that it was indexed well enough because they were returned with a search that searched the ERS name. And so, they added the information that everyone can sort of, that the attendees can take. When you say they were returned with a search of the ERS name, I thought there was a certification in the record saying that when you search the ERS name, nothing came up. No, the ERS, that's true. I'm talking about the ERS name. Yes. And you had to search the ERS name, Your Honor, because the code is clear, UCC both in Puerto Rico and everywhere else in 59507, that when you file against, a filing in the original name is good for all collateral owned until the name change plus four months. And so, when anyone is looking at lending new money to ERS, they've got to think about getting priority, not with respect to property acquired after the name change. Of course, ERS didn't acquire much property after the name change, but you have to get a senior lien with respect to property that was acquired before the name change. So, if you think there's been a name change, and again, we don't think there's been a name change, but if you thought there was, you had to search both names. That doesn't seem to be the test. The test in the statute does assume there was a name change for a moment. I know you say there wasn't, but assume there was a name change, and then after the name change, there's a filing that uses a different name, the old name. At the end of the day, practically someone would be searching both of those names, but the statute seems to say a singular test that seems to say that a name is seriously misleading if the search under that name wouldn't disclose everything. I don't disagree with that rule, Your Honor, but I think you do have to recognize the fact that there's basically two different searches that are required here. One is with respect to collateral that was acquired before the name change, and one is with respect to collateral or property of the debtor that was acquired after the name change. So, you have to search the first name, and none of the financing statements or amendments are seriously misleading with respect to the first name, and that, of course, deals with all collateral, all property of the debtor that was acquired by the debtor before the name change. And that's mostly what we're talking about here, substantially all or all property. So, not... So, are you saying that if everybody, if the name changed, no doubt about that, that continued filings in the old name would still be okay because someone was going to search the old name anyhow? That's exactly correct, and that's exactly what 9507... Judge Stahl has a question. So, if I understand it correctly, if I were going to now loan money at this point to the agency, to the state, if I was going to do that, if I didn't check the old name, I would not be in your position getting any security on the previously secured money. You'd be junior. So, you would be junior to the two names recorded on the old name with respect to property acquired during the time the old name was the name of the debtor. So, any prospective search would only take care of new money coming in. In this case, there wasn't any, I assume. Correct, Your Honor, new property coming in. This search would only... A filing against RSE showing up after 2013 would only grant seniority with respect to property acquired after that time. And as I said before, it's not just the amendments that give you that because the initial filing statements were still in the record. They may have had a defect. We think they didn't, and we'll get to that in a second. But the amendments still relate back to them. And you get there because of the definition of financing statement. And even the old definition of financing statement, which was somewhat narrower, included amendments as part of the financing statement. So, when you get six reports... You know, it's not so clear that if the amendment, assume hypothetically the amendment misnames the debtor, it's not so clear to me at least under UCC law that the original use of a correct name, putting them all together, actually satisfies the naming requirement. Well, Your Honor, at least with respect to collateral or property acquired by the debtor before the name change, the amendment links up two ways. One, it relates to the filing number of the initial filings. So, no matter what name was on it, it would still show up as connected to the initial filings way back in 2008, and it did. And then second... Suppose there was no name and just a number. The code says that's okay, too. The name is not... Yes, it does. Because it says that the file number is what's required in an amendment. I don't remember the site right now, but I'll bring it to you. There's a specific section on it. Is there evidence that that searches are indexed in the Department of State? That they're done by number? Yes. Actually... For searches. Well, the search was done by name. And then whether because it picked up by name or picked up by number, if you look at the report... My question is, is there evidence in this record that you can search by number? I don't think you can search by number. But if you search by the old name, you get all six. And whether it came up because of the number cross-reference or because of the name cross-reference, I can't tell from the record. But it came up for one reason or the other. I have a factual question that also may be the subject of agreement. We can't tell from the record. We do know who filed the original UCC-1, but we don't know who filed the UCC-3s. Was it ERS? Bank of New York, Your Honor. The trustee or fiscal agent. I don't remember what, in fact, their position is with respect to the ERS box. Filed the UCC-3s, and it was not ERS that did it. That's correct, Your Honor. Okay. Okay. Moving on to the... I want to make sure we spend some time on the bankruptcy code section 544 point. I think it's clear, we think it's clear from the cases, that Puerto Rico law does not allow any party to a simple contract to obtain or enforce liens on any property of ERS. ERS is a public agency. No, I'm not ready to move on. Sorry. They make a quite serious argument that you got the name wrong. You responded, no, we got the name right, but in any event since most of the property acquired in which we have a senior interest was acquired before the name change. It doesn't make that much of a difference. I mean, that suggests if we were to adopt that latter argument, then it would be a remand to figure out what property was covered by the old filing and whether there was any new. But I didn't think that's what you were asking for. I thought you were asking for a determination that it was error for the district court to conclude that there was a clear new name that had to be used. Okay. So it seems to me there are a number of issues that are involved here. Your briefs do make the argument that, well, if you actually look at the Spanish version, it did not change. If you look at all of the provisions of the statute, which is what you should do and not just one provision, the ERS name is prominently used. Then there is history, but there is the Puerto Rican statute that says, in case of doubt, the Spanish version is the game breaker. Now, do you have other arguments that I've not listed as to why the district court was wrong in concluding that there was an error in the name? Your Honor, Mr. Zakia has taken that topic and is the very next speaker, so I'd like to defer to him on that point. All right. That's an important point. We agree. We think that, frankly, that's where this case should turn at the end of the day, that the other arguments, there are many, many reasons why the district court erred, but I think we started on the wrong path with the decision that there was some kind of a name change in the system. You know, you can tell me, is it common for bondholders to have trusted ERS in the first instance to make a proper filing? Yes, for better or for worse, it is common, and then normally the lawyer that represents the issuer gives a certificate or an opinion that perfection has been achieved, but it is common for the borrower to do the perfection. Was such a certificate given here? I don't know, Your Honor. Yes, so there's no indication in the record. If that is habitually what happens, why did the Bank of New York file the UCC-3s as opposed to ERS filing the UCC-3s? Well, that actually may be a function of the change in law in between. Prior law required the debtor also to sign a financing statement, whereas by the time the amendments came around, financing statements could be signed only by the secured party, and amendments never had to be signed by the secured party unless collateral was added, so I think that that may be just an attribute of the fact that the law changed in between. Okay. Okay, turning to the 544 issue, this Court actually is familiar with Act 66. You've decided a case on it in Walmart, of course, but I want to focus on the language of the statute itself, the language of Act 66 itself, which says, first of all, it has supremacy over all other laws. It establishes the payment plan as the exclusive remedy, and it denies any other rights. The only additional remedy accorded in the event of nonpayment is accrual of interest for the creditor. Now, the Dignity Court tried to get around that by positing the existence of some form of nonpossessory lien on personal property that might be enforceable at some point in time but would not be enforceable at the point of a judgment. And, of course, there's a lot of authority, both in the Puerto Rico system all the way up to the Supreme Court, but also two decisions of this Court that determined that Puerto Rico law requires that Puerto Rico law, in the context of an attachment or garnishment of personal property, requires some possessory step, usually by a sheriff or another kind of third-party agent, but every so often sometimes by the lender itself. One of those cases, of course, is FDIC v. Shearson American Express. In that panel, Your Honor, it includes Judge Stahl. And another case where essentially the Court that ruled the same thing was in Property Investors v. Park Industries. There really can't be an argument about that. And since if there's anything in the language of Act 66 that's perfectly clear, it prohibits any seizures of property, it must also prohibit garnishments and attachments because of personal property. And here we're only dealing with personal property because there is no such thing in Puerto Rico law as an enforceable garnishment or attachment that does not involve a change in possession. So where does that take us? It basically means that, at least for the purposes of Puerto Rico after Act 66, and by the way, probably before Act 66, because one of this Court's opinions recognized that even before Act 66, seizures of property of municipalities was also prohibited. But certainly after Act 66, there are no rights of a lien creditor that the Oversight Board can succeed to. And if there are any rights that the Board can succeed to, they're not enforceable. So they aren't much in the way of rights at all, and they wouldn't defeat a security interest privately granted whether or not it was perfected. Now, there's an effort by the Oversight Board to try to say that the Uniform Commercial Code actually expands the Bankruptcy Code and makes 544 broader than it is. That's not true either. Initially, there are no trustees in bankruptcy in the PROMESA case, in PROMESA period. There's a definitional change in the word trustee to recognize that. So the Oversight Board gets certain rights of a trustee because in some places, including Bankruptcy Code Section 544, the statute is supposed to read Oversight Board instead of trustee because there is no trustee. This same kind of argument came up in the Jefferson County case. We cited it in the brief, but we didn't probably talk about it enough. And in the Jefferson County case, the issue was whether 28 U.S.C. Section 959, another statute of federal law that refers to trustees, had any application in that Chapter 9 case. And Judge Bennett, no relation, took a very long journey through exactly what was going on in Chapter 9 in terms of the definitional replacement and determined very clearly that there were no trustees in Chapter 9, that none of the different trustee provisions that are throughout Chapter 11 and Chapter 7 have been incorporated in any way, and the end result being that the 959 is not applicable. This Court has also done other things that suggest that it fully understands that either state law nor commonwealth law can expand or contract what bankruptcy law does. Most prominently, I guess, is the Bank of New England case where you were considering the rule of exclusiveness, which is a statewide doctrine that has sometimes been used to affect bankruptcy law applications. The only other place I'd like to go back to is to the original financing statements themselves, which Your Honor asked me to skip over, and I did at least initially, but I think it's worth going back to them because we're not dealing with a case where there's no collateral description at all. Here we're dealing with a collateral description that includes a cross-reference. And in this instance, it is a cross-reference not to a document that's in someone's file, not to a document that anyone would have difficulty finding, not to a document that is readable in a way. People wouldn't have difficulty finding it. You'd have to look someplace else to find it. Correct, Your Honor, but you have to look someplace you're going to look anyway. Why? Because the bond resolution is what describes a municipality's obligation to its lenders. You can't find it anywhere else. Official statements, there's no indentures. There's no notes. There are notes, but they're not in the classic sense. They don't include all the obligations of the municipality. Anyone thinking about lending money to any municipality wants to see and needs to see the resolution approving the prior financing. That's how they find out what is out there. Wouldn't there be an opinion as they close this transaction from a lawyer stating that, in fact, the bond resolution set forth what the collateral was going to be? There might have been, and I read it at one point in time, but I don't remember, but when I come up again for a rebuttal, I'll have the site if it's there in the record. It might be. This might be part of the official statement. Thank you. Thank you. Good morning, Your Honor. Good morning. May I retain two minutes for rebuttal? You may. Thank you. May it please the Court. Jason Zacchia on behalf of the Puerto Rico Fund Appellants, and as Mr. Bennett noted when we divided the issues, the issue of the name change or the alleged name change falls to me, so I'd like to begin by answering Judge Lynch's question. Your Honor, while I agree with all of the issues you set out, and those are all arguments we've made, I do believe there is an additional argument that we make as to why the difference. I'm not discouraging you from revealing the arguments that I outlined as having been presented in your brief. Thank you, Your Honor. And I think actually the way that it sets up is quite well, because the argument I was going to start with is the one that I don't think was on Your Honor's list, and now I'll move to those. So there is actually, I would submit, a very straightforward and easy way to resolve this case, and that is because the question is did the district court error by granting summary judgment based on a finding that the name changed when the undisputed record in this case established that it did not? And why do I say that? Because when we look at lawsuits, there is a very traditional, a very standard way in each and every civil action that exists in this country as to how we define the issues in dispute, and that is that we start with the pleadings. One of the reasons maybe the factual record on this issue was not as developed as it otherwise could have been is that this issue was never put in dispute because not the case that the board didn't plead it. They did plead it. They pled in their complaint that their name is ERS. In our counterclaims, we alleged the name was ERS. They admitted that allegation. I don't know how much purchase that gives you. The question we have is a UCC question. It's not a question of pleadings, if you will, in the federal court. I would welcome some of your more substantive arguments. Okay, Your Honor. So then let's look at this as the district court did as a question of construction and determining what was the intent of the law in Puerto Rico when the name, when the district court found the name was admitted in 2013. And Your Honor correctly listed out what I would like to expand upon some of those arguments. It is not only a question. It is undeniably true that Puerto Rico law says that if there's a conflict between the act as it was initially enacted and a subsequent translation, the initial act controls. That's undeniably true as a question of law. But it's also the only sensible and only possible resolution of the question whenever we look at any question of law, which is what was the intent of the legislature. The translation, the official translation, which the district court found to be the organic record in this case, is not blessed by, it is not reviewed by the legislature. In fact, it did not come into existence until about eight or nine months after the law went effective and was passed into law. And so if the question presented is did the legislature of Puerto Rico intend to change the name in 2013 as the court, the district court found, there's no question that that can't be true. I'm not sure if I'm going to talk to you. On day one you have a Spanish name and then you have an English translation, which is the official translation. It may or may not be correct. We have to assume it's correct. Ten years later, Spanish name changes the same. They go to translate it in the new stature and they realize they goofed. They got the Spanish translation wrong, so it's corrected and put in a new translation. We don't know if the new one is correct or not, but we have to assume since you're filing in English that what the legislature said, or rather what the new English translation said is the correct one, the most recent one. I think a better argument for you is to stay within the subsequent legislation itself and see what that tells us rather than arguing that because there was a change, the second one has to be the wrong one. So let me take that in pieces. I certainly don't want to disagree with you when you say that if you look at the 2013 amendment itself, it certainly gives no indication that there was an intent to change the name. Indeed, the first line of that amendment uses the name ERS. The definition of system, which is used in that amendment 100 times, continues the definition of ERS. And it is clearly true that even if, and I don't believe this is the correct way to think of it, but even if we assume that that one translation was the only record that we should examine, there is no basis even from just looking at that record to find that the intent to change the name was ERS. Sorry, to change the name from anything other than ERS. If I could address one other part of your question, Your Honor, and that is I just want to be clear. We say in the papers, and it is true, that the name ERS, which is Employee Retirement System of the Government of the Commonwealth of Puerto Rico, which is the full name, has been used consistently since 2004. That's true. If we look just at the ERS part, so there had been prior to 2004 times when the later parts, you know, Government of the Commonwealth of Puerto Rico, there were some changes to that. But if we look at the part about ERS, that portion of the name has actually remained consistent since ERS's founding in 1951. So we're not asking the court to determine as a matter of translation what's the right translation, what's the wrong translation. However, I do think it's important to note that if you look at the way those words had been translated prior to 2013, they had been consistently translated as ERS all the way back since the beginning and the formation of this entity. Okay. So I have a question, unless you do. I do too. And Judge Stahl does. So I'll defer to Judge Stahl and then I'll ask mine. So when the change, when the new statute or the revised statute was voted on, is there any legislative history in Puerto Rico which would give us any indication that there was to be a name change? Because one would expect, if you were going to change the name, that there would be something in the legislative history which would explain that. Is there anything? Judge Lynch, may I extend my time to answer Judge Stahl's question? Yes. Thank you. It's not going to come out of your rebuttal time. Go ahead. No, Your Honor. There is no indication whatsoever that there was any intent to change the name. Your Honor is absolutely correct. If they were going to change the name, there should be an indication that there was an intent to do so, and here there was not. That's if they were going to change the Spanish name. And everybody agrees there's no intention the Spanish name stayed constant. So the Spanish name on day one says football, and then the English says football, and then ten years later a new translator looks at it and says, ah, soccer, would be a better way to translate that, and so write soccer. From that day forward, the official English name is soccer, and that's what we'd use. I just don't see how you can assume that because the Spanish name retained the same, that the second name was the wrong one, unless you look within the subsequent legislation itself, as you started to point out, and find inconsistency there. So I'll start with the part of that question that I think Your Honor and I agree on, which is you're absolutely correct. Even if you only looked at the 2013 amendment, you can't find an intent to change the name because there's no set of facts under which you would intend to change the name, even if it was the translator making the determination, and not change the other references, including the definition of system, which is used throughout. So I agree, even if you only looked at the 2013 record, you can't find an intent anywhere to change the name. And I don't want to belabor the point, Your Honor, but I do think there is something to the fact that only the legislature has the power to change the name. The translator is not empowered to do so. Okay, that's right to my question. Thank you, Your Honor. You know, we're so attuned as judges to look at legislative intent that we tend to start there. But let's look at the UCC provision, the sufficiency of the debtor's name, which does not talk about any intent of the legislature. It could be read to say, we don't much care about the intent. We're just going to take whatever the translator says, and it's up to the legislature to cure a problem. But otherwise, it is stuck with its translator's error. Am I clear? So why should we read the UCC statement, sufficiency of debtor's name provision, to require an expression of legislative intent? So, Your Honor, I think there are a couple of potential answers to that question. I guess I'll start with the last point, which is even if we assume that that's true, and I'd like to explain in a moment why I think that's not correct, but even if it was, there is nothing in the UCC, and I think this is where we and the appellees really diverge. They want to read that UCC provision as saying, you look at the one sentence of that organic record, and only that one sentence. That's not helpful. You and Judge Kayata have covered that three times. So the other part to the answer, Your Honor, is this. On the facts of this case, we happen to have a public entity which is named by the legislature. So the UCC would apply both to public entities or to private entities. And in this, so I don't think it speaks specifically to the governmental agency, how we determine how the name is changed. I think that would be a question of Puerto Rico law. But under Puerto Rico law, it is the legislature, not the translator, that has that power. Now, if Your Honor disagrees with me. Why? Sorry, Your Honor? Why? Give me a provision in Puerto Rico law that says that. That the translator does. Well, I think that's, Your Honor, where we come to the citation of the provision of Puerto Rico law that says. That the Spanish language controls. Yes, Your Honor. It's not actually. In this case, that's what it means. But what the law actually says is if an act is passed in one language, and it is translated into another language, the original controls over the translation. So if hypothetically it had been passed in English, and there had been a Spanish translation, then the English would control over the Spanish. So in this case, the original wasn't Spanish. So the law said that the Spanish controls. But the principle is really not that Spanish prevails over English. It's that what the legislature does and the language in which it acts controls over a subsequent translation. Okay. Thank you, Court. You still have your two minutes. I thank Your Honor for your time. Thank you very much. Good morning. Jeffrey Levitin, Proskauer Rose Counsel for the Accounting Oversight Board. Well, you have a pretty good guide now to what we've been thinking about. Yes, Your Honor. I do appreciate that. First, I'd like to address the lapse question that the Court posed at the beginning of the argument. So in 2008, when the original financing statements were submitted to the filing office, financing statements had a 10-year life. They would lapse after 10 years. Puerto Rico and virtually all 50 states amended the UCC in 2012 and reduced the 10-year lapse period to five years. When the new UCC was enacted in Puerto Rico in 2012, the old UCC statutes were repealed. And 9702 of the new statute, 19 LPRA 2402, specifically provided that the new rules apply except where there's an exception specifically stated in the new statute. And the only provision in the 2012 UCC that deals with the lapse period is 9705C, which says that holders of perfected security interests as of the date of the enactment continue to get the 10-year lapse period. Holders of perfected security interests. Now these, the bondholder security interests were not perfected in 2012 because they did not have a collateral description. Now when the statute was enacted, there was a typo in 9515, 19 LPRA 2335, which accidentally kept the 10-year lapse period in effect. And why do we know it's accidental? Because in the heading of the statute it says five years, but in the text of the statute it says 10 years. That was corrected one year later. So that potentially gave the bondholders an additional one year that if they had filed an amended financing statement, they still could have had the benefit of that 10-year lapse period. But they didn't take any action during that one-year period, and then the statute was, the typo was corrected, the statute was amended, and there's now a five-year lapse period. Now the bondholders refer to a circular issued by the Puerto Rico Department of State. Now that circular, of course, does not have the force of law. And it also said that it is issuing this interpretation because a contrary interpretation would adversely affect the rights of holders of perfected security interests. So again, it was just repeating the transition rules. So it wasn't purporting to create new law or an interpretation different from the transition rules in the new DCC. So now I'd like to turn to my argument. If I've understood this correctly, they have argued, look, our later filings both perfected the earlier filings and independently stand as a sufficiently perfected filing. By addressing the last issue, you've addressed part one of that argument, but you have not addressed part two of that argument. Is that what you're about to? Yes. Okay. I'm going to. Before you leave it, you said the Secretary of State's pronouncement doesn't have the force of law. Neither of the briefs were very informative on what Puerto Rico law provides with respect to an agency determination if there's any ambiguity in the statute. In other words, is there any type of deference? Chevron or otherwise. I'm not familiar with any Puerto Rico truth. I think there is such a doctrine under Puerto Rico law, but none of you briefed that. I'm not familiar with it. Now, the aftermath of this appeal is dictated by the plain terms of the Puerto Rico statutes, the UCC and Act 66, and this court's holding immutable. Immutable, the court recognized the UCC notice filing system depends on strict adherence to the statutory filing rules to ensure reliable results for searchers. The burden of getting a filing right is therefore deliberately placed on the filings of the financing statements and not the searchers, because the filers are in the best position to do things right. Accordingly, the uniloyal court held that there were no exceptions to the UCC's statutory filing requirements, and a party that fails to comply with the UCC's simple rules does not perfect its security. Would you mind pulling that mic a little closer to yourself? I'm sorry. You need to speak up. I'm sorry. As this court stated in Uniloyal, requiring strict compliance with Article 9 can be harsh and sometimes result in a hardship on individual creditors, but that's the cost of having a reliable, easy-to-use system. Now here, the appellants failed in multiple ways to comply with the UCC's statutory filing requirements. First, there was no description of the collateral, and second, the amendments didn't satisfy the UCC because they failed to correctly name the debtor. Neither filing, either by itself or in conjunction with the other, perfected the security interest. At no point was there a UCC-1 in effect that had both a collateral description and a correct name. Okay, so 2015-2016 UCC-3s. If one were to assume that they used the correct name, are you saying they nonetheless failed to constitute a perfected financial statement? If they used the – Had they used the correct name? Let's just assume that arguendo. Assuming they used the correct name and assuming it was in the appropriate place in the financing statement, that was an argument we made below, was that it was in the incorrect field, but I think I know where Your Honor is going, but assuming that it was – I wouldn't bet on that. Assuming that it was, then yes, they would have perfected their security interest. If they hadn't used the correct name. So apart from your subsidiary argument, they didn't perfect in 2015-2016 with the UCC-3s. Depends entirely on the name issue? It does. Okay. And then I'll touch briefly on the implications of the failure to perfect. So the 2008 financing statements didn't perfect the security interest. 9402 of the UCC, 19LPRA 2152. By the way, but if you're wrong on that, if we assume, if we decide that the reference to the Enabling Act was sufficient, then of course your argument fails. If we assume that the reference in the financing statement to the Enabling Act or a description of the collateral, if we assume that it's correct, it's sufficient, doesn't your argument fail? Well, then they still need to have a correct name. If they have a correct collateral description in 2008, they would have needed to get a correct name after the name changed in 2013 to have a perfected security interest. And their 2008 security interest would need to be continued to be in effect on the date of the BOMISA filing. So if the name, if your argument is that they had to use this new name, which suddenly appeared in this translation, if I had been looking in the eight months between the time the statute was, new statute was passed and the translation, what name would I have searched under? No translation yet. No translation yet? Yeah. Your brother says it was eight months between the time the statute was passed and the translation. So I am now looking, I've come in, six months, I'm doing a search. What name would I search under? The answer is obvious. You have to search under ERS. So you really are relying that there is an actual name change somehow in that period between the date of the statute being enacted and the time when the translation occurred. I think the way to look at it is from the point of view of a searcher. And that's the focus of the ECC. Correct. If I'm a searcher after the translation, the official translation was set forth, I have to go to the statute and the provision of the organic document that states the name. That's the only place I have to look. Yeah, I just want to know, if I did that, what name do I search under? Well, once the translation is in effect, you only have to look at the UCC. The English name was used in the UCC-1, so I only have to look at the UCC, I only have to look at the English translation. They could have, the bondholders could have used the Spanish name in their UCC-1 filing. They used the Spanish name. I would have had to search the organic documents in Spanish. They could have used both. They could have filed UCCs, one with the English name, one with the Spanish name. But they only used the English name, so that's the only place that a searcher would need to go to. As I understand it, if an entity on day one has name X and on day two has name Y, on day three, when I search, I need to search both X and Y, don't I, if I want to really find out what's secured and perfected. There is a four-month grace period after the name change where acquired, collateral acquired during that period is still perfected and covered by the name change. Yeah, but this is beyond that grace period, so you need to answer the question. No, no, within the grace period, isn't a diligent searcher always going to search by prior names? Within the... Within some period of time. As a practical matter, the answer is yes. Okay. And then with respect to the, what you're calling the name change, how do you deal with the fact that if we look at it from the searcher's perspective, when I look at that new English translation and read it in its entirety, and then someone asks me what is the English name of that entity, how can I be sure which it is, given the prolific use of the prior English translation as well as the new English translation? But there's only one sentence. Sure, it says designated, but there's lots of other stuff. And when I look at the other stuff, you know, one of your arguments would be, well, the designation clause could be the official one, and the other uses of ERS could be a trade name. Except when I look at the Spanish, I see in both instances, just in the most recent legislation, that the Spanish itself is the same in both places. That would suggest that the only possible proper English translation is the same in both places. So then I'm left with an apparent inconsistency, not because there's been a change from the prior law, but because within the body of the new English translation against the context of the Spanish law, I've got an inconsistency. So wouldn't I search both names in that situation? As a practical matter, one would search both names. But for purposes of Article 9, the only name that matters is the name that's designated in the organic record, even if there's an erroneous one. But why is that? Because I don't see what in Article 9 tells us how we resolve the question of whether, if it's ambiguous and not clear what the official name of the debtor is in the public organic body of law, what in Article 9 tells us how we resolve that question? And if there isn't something in Article 9 that resolves that question, then doesn't the only answer for the searcher become search both? Now there is no ambiguity here in the translation. Let's pause it for a moment. I understand your argument that the designation clause trumps the rest, okay? But if you're wrong on that and if it is ambiguous, am I correct that there's nothing in Article 9 or any other statute that you're pointing us to that commands how that ambiguity will be resolved? I'm not aware of a statute that commands how that ambiguity is resolved. So then why wouldn't we resolve it in a way that fits what you and I have agreed is the way that any diligent searcher would do, which is to look for both names if there's an ambiguity, preserving your position that there is no ambiguity here, that there's a single designation clause that trumps. Because Article 9 requires the searcher to look at the name and have to select the, there has to be the name. But there might not be. So let's move on. The logic of Judge Kayada's line of questioning then gets you to, well, if two searches should have been made, is it sufficient to not perfect the security interest that the filing was made only under ERS and not under RSE? And what in the code would you point to to say, well, if I lose on the question of ambiguity, nonetheless I win because I should have made two filings? I'm not sure I followed the question. All right. Let's take it from the top. If the UCC frequently refers to what the pattern of search is, there's very little evidence in this record on what one does in Puerto Rico. We do know that the filing was made under the ERS name. We also know that under the RSE name they wouldn't have found the prior filing. Okay. So in practical terms, whether or not required or not, a searcher should have searched under both. Yet the filing that was made was not made under both names. Indeed, I don't even know whether the UCC would have allowed that given the same property was at issue. So how can we say, as you want us to, that the one filing alone was insufficient to perfect the interest? They had to make two filings to do that. The burden of an uncertainty should be faced. No, no, no. First, the burden of a mistake or an inadequate filing I believe is on you. Yes, Your Honor. And we've been questioning you a lot about that. Yes. But the UCC puts the burden of getting an appropriate filing on the filer, not on the searcher. And if there's an ambiguity in the name, the filer should file under both or as many names as required. Then that would show up in a search no matter what the correct name was. So the burden shouldn't be placed on the searcher. Can you do that? I anticipated that might be the answer to the question I was asking you earlier. So I looked at the UCC-1 form and it just has one box for the debtor to put a single name in. Can you file two forms? Yes. You can file multiple UCC-1 forms for the same. With different names? Different names. All right. And is there something you can point us to that would back that up? This 11 for the Retiree Committee. But one of the odd things about this case is there's a fair amount of change at issue here. The record's very skinny on how people actually do searches and do filings. Like can you file two UCC-1s for the same debtor using two different names? You certainly can, Your Honor. We did annex the filing office. But even if you can do that, that leaves the question of if they did perfect the name in one of the filings, does the fact that they didn't make a second filing under a different name, does that invalidate the perfection? In this case, there was never a perfection. But that's the argument you make. But let's assume that we get by that argument. If I'm a routine searcher in Puerto Rico and I've been around for a long time and I go in, or even not a long time and I go in to search, wouldn't I first look at the name which has always been in use? Well, first I would look at the organic record, which is what the statute provides, and see what name I'm required to search. You mean I would look at the latest translation, the one that's done eight months after the revised statute? Yes. If I was searching, the amendments here were filed in 2015, in 2016, which was well after the statute was amended and well after the translations were enacted. I think I've run out of time. If we have more questions, we'll ask you to stand up again and answer them. Thank you. I'd be happy to. Good morning, Your Honor. Richard Levin from Jenner & Block for the Official Committee of Retirees of the Commonwealth of Puerto Rico. May it please the Court, I would like to address some of the questions that just came up on the UCC issues. And if I have enough time, I want to touch on the 546. That would be advisable. What's that? That would be advisable. Fine. Let me take Judge Stahl's question first about assuming there was no name change and the correct name was used. There's two problems that the bondholders still have in that circumstance. One is, Mr. Levitin already mentioned, the filing had lapsed. So a UCC-3 amendment can only attach to a UCC-1 that is in effect. Yes, I had expected to get an answer that the UCC-3 is a different beast than a UCC-1. That was my second answer. Yes, I agree with you, Your Honor. I'm asking a question. I'm sorry. I apologize. I'm not making a statement. I didn't think this was argued in the briefs. Is there a case law out there saying that a UCC-3 that otherwise complies with the requirements for a UCC-1 can't serve the same function? Yes, there is. There's case law that says if it complies, but there are, so that's the second part of this. First of all- Yeah, I know that. I asked you assuming it complies. Yes. Why wouldn't a UCC-3 that has all of the data required in a UCC-1, why wouldn't it operate to perfect the filing? Because the UCC-1 form is a specific form that the statute requires, and you can't just put in what I'll call any piece of paper. This UCC-3 did not have the debtor's name on the front page as the UCC-1 is supposed to have. It did not have the- there are boxes on the UCC-1 form. I don't have it in front of me here, Your Honor, but there are boxes. The statute requires that those be filled in so that the filing officer doesn't make mistakes and doesn't have to search through pages to figure out how to file this thing. So that's why I say that the UCC-3, and this was argued extensively below, Your Honor, I don't think it was covered so much in the appellate briefs, that the UCC-3 was not sufficient to meet the requirements of UCC-1. I'm sorry, that this UCC-3 was not sufficient to meet the requirements of UCC-1, and therefore would not have sufficed by itself to perfect the security interest. Okay, well maybe I'm going to have to pull both forms, but I'm still not sure I understand why. Because the- There was no filing mistake made by the clerk here, right? No, there isn't. I thought it was agreed that the ERS name searcher would have, using that name, found this filing. Yes, in fact, they did find it. If you do the UCC search, they did, in fact, find it. But the statute, as I think the briefs address, is designed to be- Yes, you're going to fall back on the Unaroyal case. I think we've exhausted this issue. Yes. Move on. Okay, happy to. Next point, to Judge Keada's questions, it's not so much a question of what a searcher should do. A diligent searcher is going to search on a lot of names. If they can, if they know there's a trade name, they're going to look. But rather, what a searcher must do, and the statute requires the searcher look only for the registered name. Let me turn to that issue as well, which we discussed briefly. That's pretty clear. In other words, if the name were indisputably X in the later statute, notwithstanding the fact that it used to be Y, and the statute sets forth a test for seriously misleading, and it's seriously misleading if you use anything other than X that when searched would not produce X. That's correct. Okay. But it seems to me the tougher question we had before is recognizing that you are arguing that the designation clause gives the name and that's it. If we disagree with you on that, and if we conclude that the new English translation is ambiguous as to whether one of two different names would be the one, then it seems to me we come to a question, who as a matter of law and practice do we place the burden on to accommodate that ambiguity? Do we place it on the filing creditor, having noticed that there are two names to file under both names, or do we let the creditor willy-nilly pick either name and put the burden on the searcher to search under both, assuming that both have been reasonably diligent to look at the English translation? Do I not do willy-nilly? Well, I think not, actually, because their position would be that you could flip a coin. The other side's position is literally that you could flip a coin and pick either name, I think. So let's stay with that. Okay. So what law is there or what principle is there that tells us that the burden should be on the filing creditor to file under both names? The burden is on the filing creditor to get it right, and if the filing creditor is unsure because of an ambiguity, then the filing creditor has the burden to file under both names to make sure, not on the searcher to search both names. That's the whole purpose of the statute for the creditor, filing creditor, to get it right. And let me refer to Section 9503A1, which refers to the name set forth, designated by the organic document. And I try to hypothesize a Certificate of Incorporation of a commercial entity that says the name of this entity is X, and then throughout the rest of the Certificate of Incorporation filed with the Secretary of State, it uses a trade name throughout. Admittedly, there's no translation issue there. You know, I just don't think of this as a trade name. This is a semi-governmental agency named by the legislature and then named by its various trustees thereafter. I'm not sure I buy the trade name analogy. If it were a trade name, then you'd see a variation in the Spanish version of the most recent legislation. Because you don't see that variation, it does suggest why am I seeing for the exact same Spanish phrase two different translations. Let's simplify the question. Suppose the new English, the new statute and the English translation of it simply had two mentions of the name, and it said the official designation of the name is ERX, and then the next sentence said the official designation of the name is RSE. That is clearly ambiguous. You've got two official designations. And so you're back to your position is that the filing creditor needs to protect its rights, needs to file under both, because that is the only way it could assure itself that it filed under the correct name. Yes, and the searching creditor would go to the Organic Act and say what's the official name? In this case, the RSE name, and would search under that name. Now, the searching creditor might also choose to search under ERX. I understand that's right. Is there any case law out there at all that tells us that we should put the burden on the creditor to file under both names? Because, for example, the creditor is trying to protect its interests. I think that's how the UCC is. I don't have a citation right now. I think that the statute makes that clear, and I think there is case law, but I don't have a citation for you at this moment, Your Honor. Was there an original translation of the original way back when? 1951? You don't know? I'm not sure. So we don't know what that said? I'm not aware. And it's not in the record? Correct. And on the official translation point, the point about this translation is that it is an official translation. It's not a certified translation. It's not unofficial. Actually, I thought there was one in 1951, and it used the ERX. Your Honor, I believe that's correct, but I didn't want to answer with certainty to Judge Stahl's question because I don't have it in front of my mind on that. Because what I'm interested in, if there was a translation back in 1951, which uses the name which has been used all these years of the interim time, why don't we look at that and say that's obviously the correct translation? Well, as Judge Piatta said earlier, it might be that that was the incorrect one, and people got used to saying it that way. But it was incorrect then for many, many years. And doesn't that at some point of... I'm trying to think of putting myself in the shoes of a responsible person trying to look at this.  You look at the statute. I'd like to go back to the topic you and Judge Piatta were pursuing. There are different positions that could be taken here. One is no, you're wrong. The organic statute doesn't clearly designate RSE. There's enough in it that it... Another is there's some ambiguity about it. And then we follow the ambiguity train of thought, and you say, well, under those circumstances, the burden falls on the creditor to be sure... I'm sorry, the bondholder, counsel for bondholders, to be sure that creditors out there are protected by filing under both names. What we know as a practical matter is if you filed under RSE, you wouldn't find the prior security interest. But if you filed under ERS, you would, and you did find the security interest. Now, in other areas of law, we have a sort of harmless error doctrine. And it's a little bit hard for me to see why the result of saying no, filing under one, the one that most people out there would be more likely to use, but not filing under the other is a sufficient violation of the UCC, though we should say that the filing under ERS was not protected. I think that the case law is clear that there is no harmless error doctrine in the UCC. Now, granted, but in the end, this is about notice. Well, it is, but I think if you follow that path here, then the courts are going to be confronted time and again. I hope not. I hope the Puerto Rico legislature is truly generous. I'm not talking about Puerto Rico, but I mean the UCC. This would be a general UCC decision. How many translation errors between legislation passed in Spanish and English translations are likely to come up under the UCC? I was referring to what I'll call the common names as Judge Stahl. You've gotten used to calling. Yes, but we have moved well beyond that. Okay. Your Honor, if I just have a few minutes to touch on the 546 issue. I want to make a couple of quick points. Go ahead. Mr. Bennett said there is no trustee here, and I think he overlooked Section 926A of the Bankruptcy Code, which is incorporated into PROMESA in Section 301A, and that provides that if the court may appoint a trustee to pursue any of the avoiding power causes of action. So you can think about 9317 of the Puerto Rico UCC, which gives priority to a bankruptcy trustee, as applicable in PROMESA, and is it really necessary to take the extra step for the debtor not to bring the action and the court appoint a trustee and then get the same result? I think 926A addresses that question. And the second point I'd like to make, Your Honor, is Congress was well aware that, generally speaking, under municipal law, as this court recognized when it held the Recovery Act unconstitutional, later affirmed by the Supreme Court, that remedies traditionally available in bankruptcy, like fusing assets, are traditionally unavailable in enforcing the payment of municipal debt. The House of Representatives and the Senate put that almost identical language in multiple House and Senate reports enacting municipal bankruptcy law. And then along comes 1978, and they include 544A, and they incorporate that into PROMESA, shortly after this court issues the Recovery Act decision, and shortly, two years after Puerto Rico enacted Act 66, we need to presume that Congress, and I think we're required to assume, that Congress was aware of the state of the law, and, as the Supreme Court has said, in the United States against Nordic Village, the settled rule is that a statute must, if possible, be construed in such fashion that every word has some operative effect. If the bondholders are correct, then including 544A in the statute here would have no operative effect. Congress, I think, meant to legislate that unperfected security interests should be set aside in these circumstances, even if not, and now we're in municipal land rather than commercial, even if the technical way of getting to that result might differ. And if this court concludes that the general rule in municipalities that assets may not be seized and liens may not be granted applies, then that would effectively eliminate the need for any municipal bondholders to ever file financing statements again, which I think would be a tremendous disruption in the law. There's long an honorable tradition of counsel arguing a parade of horrible statements. Thank you. Thank you, Your Honor. Thank you. First question. He says, because the original UCC-1 was not perfected and your lapse argument turns on, he says it doesn't work because he didn't perfect the UCC-1. When you argued to us, you did not refer to perfection. Can you address that and then move on? Yes, Your Honor. It's a supplemental addendum, page 48, 19 LPRA 2153, which is the same as the old 9403, except it's provided in subsection 6, which is applicable. For example, a filed financing statement, not one that is effective, not one that is perfection, is effective for a period of 10 years from the date of filing. So the extension, the provision that was carried forward was a 10-year period for a filing, not for an adequate, or in their view, adequate filing. This is as good a place as any to start with a response to Judge Stahl's request for some information. There is, in fact, one of the opinion letters in the record. And it turns out it's an opinion letter that was rendered by counsel for ERS after the Bank of New York made the additional filings. And the Bank of New York apparently asked for confirmation that the perfection was adequate. It's at the appendix at pages 1172 and 1173. And I would commend all of you to the first, excuse me, second full paragraph on page 2, in the middle, where they actually go out of their way to state, we find that the collateral description contained in the financing statements, it's referring to the originals, as filed are legally adequate. So why do we care about that? Because this isn't really an adversary proceeding between the bondholders and the debtor. The interests at stake here are the unsecured creditors who weren't parties and didn't make statements. So it seems to me you could have a woefully sufficient UCC-1. Who cares if the lawyers or the debtor say it's sufficient? You were answering a question. Thank you. Your Honor, I wasn't answering a question. I think it has significance for the whole idea of whether the public record should be regarded as a permitted cross-reference for the definition. And if the debtor thought it was, I think it belongs someplace on the scale. Another question we were asked is, where in the code does it say that the amendment only has to have the filing number? That's New Puerto Rico, UCC number 9-512, open paren, A, close paren, open paren, 1, close paren,  open paren, 1, close paren. The next point I want to go to is Unaroyal. Unaroyal, as Your Honors know, is a 1977 case by the circuit. That was not the last time the circuit spoke on the proper method for interpreting the UCC. In re Halmar Distributors, 968 Fed Second 121, a 1992 case of this court, the quote was as follows. After being urged the strict enforcement views, quote, we will follow the code's directives to construe its provisions liberally, period, close quote. Unaroyal, by the way, was where, which office you file in. So that's a lot different because there, if you don't have a filing in at the right office and the creditor goes to the right office, it kind of comes up with nothing. So I think that may have informed the Unaroyal Court. Anyway, by 1992, at least, there was a different view. Your Honor's question with respect to whether or not a filer has to file against multiple names, I think is answered by New Puerto Rico Article 9-503, 19 LPRA 2323, open print B. And this section is called Additional Debtor-Related Information. A financing statement that provides the name of the debtor in accordance with Subsection A of this section is not rendered ineffective by the absence of open print 1, a trade name, or other name of the debtor. Right, but the predicate to that is that you do have the name of the debtor. Correct, and we think, Your Honor, I agree with your line of questioning that suggested that what you come away with when you read the English translation is confusion. And there's, and so I think the practical thing is is to research both names, but there's another practical thing, which is clearly this translation's got two translations. Let's go back and look at the statute and see if anyone was changing the name. And I would point out, also, about the 1951 point raised by Judge Stahl, that the legislature in Puerto Rico knows what the name of ERS is and has since 1951. Incidentally, in the moratorium law that you, Your Honors, ruled on separately, it calls ERS ERS after this translation. I don't know what that means either. I don't know what that means either. But all I'm saying is that the legislature knew what the name was and could have directed the change of the English name if that's what they wanted. It doesn't sound like they wanted it. Let's assume we're wrong, though, and let's assume it is ambiguous as to what the new name is. And so we're back to the question of who we place the burden on. Well, this statute says you have to have one of the right names. And if both are right, then I think this particular statute says if you've got one, the filer has done his or her job. But then you would have to determine what's right. Suppose it's ambiguous as to what right. As a policy matter, wouldn't it make more sense to require the lien holder, here the bond holders, to file under both names? Therefore, every subsequent searcher could search under either name and would find it, rather than have the lien holder pick one of the two names when it knows there's some ambiguity and then require every subsequent searcher to do two searches. Well, you've just raised the price of financing, maybe at the margin, because you're basically telling all secured parties to go back and look at the record every four months. Because otherwise, how would you know? And you've got to search in lots of different places to try to figure out what the state of affairs are. Now you're on to the lapsing one. If you had a prior time period during which the name was unambiguously X and you had a perfected financing statement with X, then that's good, subject to lapsing, irrespective of who we place the burden on for a later one filed when there's an ambiguity. That's true, but there's still some burden. And not all secured creditors are going to have a situation we do where there's substantially all the collateral was acquired. So how would a... I'm thinking of the other side of the policy argument. How would a searcher, having looked at RSE and thinking that was the correct name, how would that searcher know to go look at RSE instead of ERS? Well, with respect, I don't think there was ever a situation in this case where a searcher got to see any document that only had RSE and unambiguously said RSE. No, that's my question. I didn't mean to do that. I'm concerned about the burden on the searchers, okay? So we have an ERS filing. They find that. Judge Chiodo's question was it's not much of a burden to put on you all to make two filings. I'm thinking of the burden on the creditors who are doing the searches to be sure they have done a complete search. How would... If they only found your ERS filing, how would they know to go on and do another search? Is there some linkage in the UCC between these filings under different names? Not to my knowledge, Your Honor. I frankly don't think there is a linkage in the system. I think the additional burden is in policing and deciding what to file, not just filing an additional piece of paper. And for better or for worse, the code in this instance, if it is an ambiguous situation or if it's both, then I think either one satisfies the burden on the creditor today. Would it be a good idea maybe to change that? I can see the point, but that's not what the statute says now. Well, maybe you'll volunteer if the ALI does a further restatement at the UCC. Okay. I just want to cover a couple of other things. On the official forms requirement, there is no requirement to use the official forms in the UCC. It's a safe harbor, that's all. You find that in the official comment number 2 to UCC section 9-521. As to the issue of whether UCC3s can be UCC1s, this has actually been decided by no fewer than three circuits, and I don't know how many lower courts. The sites are in the brief. I don't remember them all off the top of my head. I want to repeat that it's extremely important that the definition of the financing statement says read everything that comes back, and so once you get things back because you do look for the ERS name, which I think you're required to do because of 9-507, you get every conceivable piece of information that is required by the code. On Act 66 and whether or not that turns 544 into a dead letter, as your honors probably know, although I believe that this is the First Circuit's problem, the Virgin Islands are also in trouble. This law would likely apply to them. To the best of my knowledge, the Virgin Islands does not have an Act 66, so there's nothing about what's happening in this courtroom today that would turn Bankruptcy Code section 544 into a dead letter in the municipal finance space, or in Puerto Rico, all it would do is recognize that Puerto Rico itself has taken attachments and garnishments and other forms of seizures of governmental property off the field as permitted creditor's remedies, and by doing so took them off the field as to what the Oversight Board can assert as a 544 hypothetically creditor. If you have any other questions, I'd be happy to answer them. Believe it or not, we don't. Thank you very much, Your Honor. Thank you very much, Mr. Zucchia. I do want everyone waiting on the next case to know that we will take a break before we move on to that case. Your Honor, thank you. Mr. Bennett made a number of my points. I will not repeat them. You better respond to Judge Kayada's question about why not place the burden on your party to make two filings in the case of ambiguity. I think, Your Honor, if there is a case of ambiguity and we go down the road of... As Your Honor, I think, said, if we go down the road of resolving ambiguity, the way you would do that here is to look at, if we view this as a question of law, of the legislative intent. We spoke earlier about why legislative intent, I believe, does control, and here, because we have the translation issue, we have very clear indications... I'm sorry. I think you're evading the question. Let's assume that there is genuine ambiguity, not that legislative intent resolves this question. Let's assume it. Why shouldn't the burden be on you to file two financing statements, one under each name? Because if we take the hypothetical, and I'll apply to the facts in this case, but to be directly responsive, I'll just respond in the abstract. If we assume that you have genuine ambiguity as to two names, there is no purpose to creating the requirement that we have duplicative filings and duplicative searches. I believe, just if we're talking as a matter of policy, and I think the law actually, as Mr. Bennett said, said that if you have two names, you only have to file under one and therefore search both. But I think that that's right, because it is very little burden on the searcher that sees that ambiguity to resolve it by searching under both names. Every searcher, you could have 100, would have to do two searches as opposed to one creditor filing two UCC1s, and then every searcher doing one search. Right, but if we have the... The searches are easier than the filings, and it's not going to clutter the record with duplicative. So let's apply it to the facts. I'm sorry. There's a premise to that question, and I may understand it incorrectly. Aren't the searches done by the name of the debtor? Yes, you are. Okay, so if the debtor is named both RSE and ERS, how does one know that you have to search both names? If the search were done by the name of Altair, it would be a different matter. Then you look up Altair, and you see two different statements. So here you are, you would run ERS, and you would have found R statements. I thought the hypothetical question is, should there be a requirement that you search RSE, which just... And I don't want to belabor the question. Yes, that is the question. Yes, but on this record, there's no indication that that name was ever used anywhere. So there is no reason that... If we want to apply the hypothetical searcher to the facts of this record, you would see RSE and ERS, and you would have potential confusion based on that statute. But there would be no confusion on this record, because there is no evidence of any kind that ERS ever called itself anything other than ERS. Now you're fighting the hypothetical, because a diligent searcher, we would charge with having to go look at the statute to see what the public organic name is, because if they don't, they're out of luck if they just use a trade name. So let's assume we have here a diligent group of bondholders which actually go read the translation, which I suspect from this record they didn't hear, and they notice there's an ambiguity. Should they file two pieces of paper or one piece of paper? And then let's assume we've got subsequent putative creditors who wish to know what property is tied up. There, if they're diligent, we can expect that they will go read this statute. Notice what we're assuming is an ambiguity, although I understand you say it's not. Do all of them then have to do two searches, or should we just say have the creditor file two statements, two pieces of paper, every subsequent creditor then just run either name that they read in this official translation? Either name or both names. Either. So, Your Honor, I do not mean to fight the hypothetical. I did want to point out two points. One, you're right, we don't believe that there's true ambiguity. Two, even if there was, on this record, no searcher would be confused by RSE, because that's not a name that's ever appeared anyway. But to address your question of true policy, if we assume that there was legitimate confusion, and maybe it's just an issue over which different minds, reasonable minds can differ, but I don't see any basis to find that it is better as a matter of policy if you assume there are two reasonable conclusions as the name. To put the burden on the filer to file multiple times under both names as opposed to the searcher to simply, in that instance, where you have, and I think it's probably pretty rare, because usually it's not as much confusion over both names, to have that searcher search both reasonable names. And I don't know if that, I want to be responsive to Your Honor's question. I'm not trying to, did that, I'm not asking if you agree with my answer, but did that address your question? Well, yes, I think, I'm not hearing any authority, and I'm not hearing why you would have multiple people do something twice rather than one person do something twice. So, I was trying to address the policy issue. I think Mr. Bennett addressed the authority issue that the UCC is clear that if you conclude there are two names, the statute says that the filing is permissible if it's filed under either, not both, of the permissible names. Now, I admit that requires Your Honor to agree with us that ERS is at least one of the possible names, and we would submit on this record that is beyond clear. Sorry, sir. If the searcher's language, first language was Spanish, and he went and looked at the statute as reenacted, would he have seen anything different which would have made him say, aha, when I look at the English, I should look at a different name, or would he have seen the same name that's always been there from the beginning? Absolutely the same name, Your Honor. There was nothing, I'm sorry, just one second. No, go ahead. There was nothing in either the legislative record or the original Spanish text or anything other than this translation issue in 2013 that indicated that anyone ever wanted to change the name of ERS to anything other than ERS. So certainly between the time when the statute's revised until the translation comes out, the responsible searcher would only look under the name which has always been there, ERS. Yes. In response? Your Honor would say that when the statute's official translation comes out, then they have an obligation to stop looking under two names. What do you say to that? Sure. I believe there is no support in the law, both for the reasons that we discussed before, the translation under Puerto Rico law, the translation cannot trump the legislation, and the discussion that we've been having here, if you did find based on the translation that there were two names, the law says filing under either name is appropriate. And so our filings would be proper no matter which way you looked at that. I'm wondering if we're beginning to set up a system that filings should be made both in Spanish and in English, which, of course, would be burdensome in Puerto Rico. I don't actually know whether there is any Spanish language UCC filing system in Puerto Rico. My understanding, Your Honor, is that you could file in Spanish or English, although English is, as I'm informed, the more typical. And certainly here, remember, the decision to file in English was in the original financing statements, which were made by ERS. Okay. I thank the Court. I think that's it. Thank you. It's been very informative. We'll take it under advisement, and the Court will be in recess. All rise. For the next case.